[Cite as *Grand Valley Local School Dist. Bd. of Edn. v. Buehrer Group Architechture & Engineering, Inc.*, 2016-Ohio-716.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Grand Valley Local School District<br>Board of Education et al., | : | |
| | : | |
| Plaintiffs-Appellees, | : | |
| | : | |
| v. | | No. 15AP-412 |
| | : | (Ct. of Cl. No. 2014-00469-PR) |
| Buehrer Group Architecture &<br>Engineering, Inc. et al., | : | (ACCELERATED CALENDAR) |
| | : | |
| Defendants-Appellees, | : | |
| | | |
| Jack Gibson Construction Company, | : | |
| | | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 25, 2016

**On brief:** *The Riley Law Firm,* and *David J. Riley,* for plantiff-appellee Grand Valley Local School District Board of Education.

**On brief:** *Michael DeWine*, Attorney General, *David A. Beals* and *Jerry K. Kasai*, for plaintiff-appellee the Ohio School Facilities Commission. **Argued:** *David A. Beals*

**On brief:** *Lane, Alton & Horst, LLC, Joseph A. Gerling, Scott A. Fenton*, and *Porter, Wright, Morris & Arthur,* and *Brian L. Buzby,* for defendant-appellant Jack Gibson Construction Co. **Argued:** *Scott A. Fenton*

APPEAL from the Court of Claims of Ohio.

HORTON, J.

{¶ 1} Defendant-appellant, Jack Gibson Construction Co. ("Gibson"), appeals from the decision of the Court of Claims of Ohio granting summary judgment in favor of

plaintiffs-appellees, Grand Valley Local School District Board of Education ("Grand Valley") and the Ohio School Facilities Commission ("OSFC"), on Gibson's counterclaim for breach of contract. For the reasons set forth below, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The OSFC is an agency of the State of Ohio that provides financial assistance to local school districts for the construction and rehabilitation of school buildings throughout the state. The agency partnered with Grand Valley to build a new school building in Orwell, Ohio in 2001. Grand Valley and the OSFC contracted with a number of engineers, architects and contractors for the design and construction of the school, which occurred between 2001 and 2005. Pursuant to a contract entered into on October 14, 2003 ("General Trades Contract"), Gibson was the general contractor on the project.

{¶ 3} Dissatisfied with the final construction, the OSFC and Grand Valley filed suit against the contractors and their sureties in the Ashtabula County Court of Common Pleas on February 25, 2014. The complaint included claims against Gibson for breach of contract and for breach of implied and express warranties. The OSFC and Grand Valley alleged that Gibson failed to construct the school in accordance with the plans and specifications, failed to comply with and perform under the terms of the General Trades Contract, and failed to correct, repair or remedy defective materials and installations.

{¶ 4} Gibson brought a counterclaim against the OSFC and Grand Valley on May 5, 2014, alleging that the parties had entered into a Memorandum of Understanding ("MOU") that authorized Gibson to perform remedial work on the school building. Under the terms of the MOU, the OSFC and Grand Valley had allegedly agreed to pay for the work that Gibson had performed, including "repairs to the masonry, roofing and asphalt" of the school. (Counterclaim, 11 at ¶ 7.) According to Gibson, it had performed $156,276.13 worth of work authorized by the MOU, but the OSFC and Grand Valley only made a partial payment in the amount of $17,487. (Counterclaim, 12 at ¶10-15.) Gibson therefore sought damages in the amount of $138.789.13, as well as pre- and post-judgment interest and costs. (Counterclaim, 14.) Because the counterclaim against the OSFC and Grand Valley brought the case under the jurisdiction of the Ohio Court of Claims, the case was removed to that court on May 15, 2014. (Petition for Removal.)

{¶ 5}   On July 15, 2014, the OSFC and Grand Valley filed a motion for summary judgment or, in the alternative, judgment on the pleadings on Gibson's counterclaim. They argued that the MOU was not an enforceable contract because its non-specific terms did not demonstrate a meeting of the minds, and because no evidence showed that they had approved it in accordance with the certification requirement of R.C. 5705.41. The OSFC and Grand Valley also argued that the $17,487 payment to Gibson had been made pursuant to a $20,000 purchase order, not the MOU. As evidence, they attached a copy of the purchase order to an affidavit from Grand Valley's treasurer swearing that it was the only "commitment of funds" that the school district had made to Gibson.

{¶ 6}   Gibson responded on September 29, 2014, with a memorandum in opposition, supported by an affidavit of its president, Jim Breese. Gibson pointed to signatures by the parties on the MOU, Gibson's performance of work, and payment from Grand Valley as evidence that a meeting of the minds had occurred. Gibson also argued that a certificate of available funds under R.C. 5705.41 was not required because a more specific statute applicable to school boards, R.C. 5705.412, did not require certification for contracts funded by proceeds from a local bond levy.

{¶ 7}   On March 11, 2015, the Court of Claims issued a decision sustaining Grand Valley and the OSFC's motion for summary judgment, granting them judgment as a matter of law on Gibson's counterclaim, and remanding the case to the Ashtabula County Court of Common Pleas. In its decision, the court found that the parties had only agreed to the $20,000 payment authorized by the purchase order. (Decision, 10.) It further found that even if the MOU were construed as a contract, it had not been breached because no evidence demonstrated that the work in question had been completed to the satisfaction of Grand Valley and the OSFC, as required by the plain language of the agreement. (Decision, 9-10.) Furthermore, fiscal certificates that demonstrated compliance with R.C. 5705.41 had been attached to both the original General Trades Contract and the purchase order, but the MOU lacked any such certification, which further demonstrated a lack of authorization for work done in excess of the $20,000 authorized by the purchase order. (Decision, 10.) The Court of Claims also noted that, under R.C. 3313.46, construction or repair of a school building with costs in excess of $25,000 must comply with the competitive bidding statutes or be declared an "urgent necessity," but Gibson had pointed

to no evidence to demonstrate that either exception applied to the MOU. (Decision, 11.) The court concluded that there had been "no meeting of the minds with regard to any 'reasonable compensation' over $20,000 for Gibson's work under the MOU," and remanded the case back to the Ashtabula County Court of Common Pleas. (Decision, 11.)

{¶ 8} Gibson now brings this timely appeal, asserting the following as assignments of error:

[I.] There exist several genuine issues of material fact concerning whether the Memorandum of Understanding was an enforceable agreement.

[II.] R.C. 5705.412 specifically applies to school districts and controls over the provisions of R.C. 5705.41, a general statute that applies to subdivisions or taxing districts.

[III.] Because the remedial work at issue in Jack Gibson's counterclaim was not paid from an account containing Grand Valley's general operating revenues, a R.C. 5705.412 fiscal certificate was not required to be attached to the Memorandum of Understanding.

[IV.] Because Grand Valley did not raise R.C. 3313.46 as an affirmative defense in their answer to the counterclaim or mention this statute in its motion for summary judgment, the trial court committed reversible error by relying upon R.C. 3313.46 as an additional basis for ruling that the Memorandum of Understanding was not an enforceable agreement.

{¶ 9} As an initial matter, we note that Gibson's purported assignments of error are framed as legal propositions that would be more properly presented in the statement of issues.

The "Assignments of Error" should designate specific rulings which the appellant challenges on appeal. They may dispute the final judgment itself or other procedural events in the trial court. The "Statement of Issues" should express one or more legal grounds to contest the procedural actions challenged by the assigned errors.

*North Coast Cookies, Inc. v. Sweet Temptations, Inc.*, 16 Ohio App.3d 342, 343-44 (8th Dist.1984).

{¶ 10} As written, the first, second, and third assignments of error fail to dispute, or even identify, any action taken by the Court of Claims. The fourth assignment of error references a "ruling" by the Court of Claims, but assigns error only to a conclusion of law, not to any procedural action or the final judgment entered by that court. Furthermore, we have observed that an assignment of error that, like Gibson's first one above, "only generically [claims] that there are genuine issues of material fact remaining without specifically setting forth any alleged errors made by the trial court" is vulnerable to being "simply overrule[d]." *Eichenberger v. Tucker*, 10th Dist. No. 12AP-515, 2013-Ohio-805, ¶ 5, *citing North Coast Cookies*. Nevertheless, it is clear from Gibson's briefing that it believes that the Court of Claims erred by sustaining the motion for summary judgment and granting judgment as a matter of law in favor of Grand Valley and the OSFC. The ten issues Gibson presents for review adequately "express one or more legal grounds to contest th[ose] procedural actions" by the Court of Claims, even without any specific reference to those actions in the assignments of error. *North Coast Cookies* at 343-44. Accordingly, we will review the Court of Claim's decision and consider Gibson's arguments for its reversal in light of the legal arguments that are stated in the assignments of error and, for the most part, largely repeated in the statement of issues.

## II. STANDARD OF REVIEW

{¶ 11} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 12} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most

strongly construed in that party's favor.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 13} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case.  *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.  *Id.*

## III. FIRST ASSIGNMENT OF ERROR

{¶ 14} In the first assignment of error, Gibson argues that there was sufficient evidence that the parties had reached a "meeting of the minds" to enforce the MOU for the amount of the work it performed, even in the absence of a provision containing a specific price term.

{¶ 15} " 'A contract is generally defined as a promise, or a set of promises, actionable upon breach.  Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract."  *Id.* at ¶ 28, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991). To be enforceable, a contract's terms "must be definite and certain." *Episcopal Retirement Homes* at 369, citing *James Ward & Co. v. Wick Bros. & Co.*, 17 Ohio St. 159, 164 (1867).

{¶ 16} "In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties. The general rule is that contracts should be construed so as to give effect to the intention of the parties." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51 (1989), citing *Employers' Liab. Assur. Corp. v. Roehm*, 99 Ohio St. 343, 344 (1919), syllabus, and *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 246 (1974), paragraph one of the syllabus. Parties are free to "contract for the terms they want, and the 'intent of the parties is presumed to reside in the language they chose to use in their agreement.' " *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, Slip Opinion No. 2015-Ohio-3716, ¶ 35 (Sept. 15, 2015), quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). "Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Id.*, citing *Henderson-Achert Lithographic Co. v. John Shillito Co.*, 64 Ohio St. 236, 252 (1901).

{¶ 17} With these principles in mind, we turn to the MOU itself. In structure, the agreement consists of a prefatory paragraph, sixteen "Whereas" clauses, and three paragraphs describing how the parties "agree[d] to proceed." The relevant provisions of the MOU are as follows:

> This Memorandum of Understanding ("Agreement") is entered into between the [OSFC] on behalf of [Grand Valley] (collectively "Owners") and [Gibson] (collectively the "Parties") concerning issues surrounding work performed by subcontractors of Gibson at [Grand Valley].
>
> WHEREAS, Gibson was awarded a contract with [Grand Valley] to perform General Trades Work including masonry at the new K-12 School (the "Project"); and
>
> * * *
>
> WHEREAS, Gibson denies that its work on the Project was deficient in any manner but agrees to work with the Owners to attempt to address any of their concerns related to the Project; and
>
> WHEREAS, Gibson without admitting to any liability to the Owners, has agreed to work with the Owners to attempt to settle and compromise all claims related to or arising out of the Project; and

WHEREAS, Gibson has agreed to work with the Owners to identify and correct certain masonry and other work ("remedial work") that does not meet the Owners' expectations and the Owners have agreed that certain aspects of the remedial work will include betterment, and that **reasonable compensation will be due Gibson for such items and will need to be evaluated prior to and/or as work progresses, with payment after satisfactory completion of said work**; and

WHEREAS, the Owners have also identified certain remedial work that is not the responsibility of Gibson or its subcontractors and Gibson has agreed to correct this work; and

WHEREAS, it is the intent of the Owners to provide reasonable compensation for remedial work that is not attributed to Gibson or its subcontractors as agreed by the Parties; and

WHEREAS, Gibson and the Owners have retained consultants to determine the items of remedial work referenced herein, and the consultants have agreed as set forth in Attachments A and B to **the approximate scope** of the work; and

WHEREAS, **the Owners will provide the design, specifications and scope for the remedial work**; and

* * *

WHEREAS, upon Gibson's completion of any remedial work pursuant to this MOU, the Owners will release Gibson from any and all claims related to or addressed by the remedial work undertaken by Gibson on the Project, but reserving any claims for the remedial work itself; and

WHEREAS, the Parties desire to attempt to resolve the aforementioned issues in a good faith manner,

NOW THEREFORE, the Parties agree to proceed as follows:

1) The Parties agree to move forward in a good faith manner to resolve and/or clarify any issues as set forth in the attached documents or otherwise discovered during the remediation process regarding Gibson's subcontractor's work on the Project, or other issues not attributable to Gibson or its

subcontractors. Good faith is construed to signify that discussions and negotiations are ongoing.

2) Gibson agrees that it will enter into mediation within 60 days of a request to do so to resolve any dispute arising under this Agreement.

3) The OSFC agrees that as long as Gibson is involved in good faith negotiations with the OSFC on the dispute, that this matter will not be used by the OSFC in any determination by the OSFC that Gibson is not a responsible bidder.

Agreed to by the Parties this 23rd day of July, 2013.

(Emphasis added.)

{¶ 18} The foregoing provisions do not demonstrate that the parties intended the MOU to authorize payment to Gibson in any specific amount for the remedial work referenced in the agreement. Rather, the MOU memorializes the parties' respective positions on a number of issues that arose after the unsatisfactory construction of the school, such as the necessity of having remedial work performed and Gibson's denial of liability, as well as the parties' mutual wish to resolve their dispute through negotiation and mediation instead of litigation. The provision Gibson points to as the basis for its counterclaim contains no specific price term for the work it mentions. In the absence of any specific term, we will not presume that Grand Valley or the OSFC intended to authorize payment to Gibson for over $150,000 worth of work by entering into the MOU. *Hope Academy Broadway Campus* at ¶ 35.

{¶ 19} In fact, the MOU expressly states that any "reasonable compensation" paid to Gibson "will need to be evaluated prior to and/or as work progresses, with payment after satisfactory completion of said work." This language should have put Gibson on notice that it would have to obtain approval for compensation before starting work, or, at the very least, while performing the work. Based on this provision, the only point on which the parties clearly reached a "meeting of the minds" was that any compensation needed to be approved by Grand Valley and the OSFC. Thus, Gibson began and completed work without approved compensation at its own risk. Any specific amount of payment for the remedial work was outside the scope of the MOU, and by implication, required a

separate agreement for authorization of payment, such as the purchase order for $20,000 worth of remedial work.

{¶ 20} The MOU also references the "approximate scope" of the remedial work, based on attached inspections by consultants, but then states that "*the Owners will provide* the design, specifications and scope for the remedial work" to be performed. (Emphasis added.) This language gave Grand Valley and the OSFC the authority to determine the scope of the work. Furthermore, this language contemplates approval at some future time. If the scope of the work was to be determined later, any "reasonable compensation" for performing it would have to be determined later as well.   This further supports our conclusion that the parties did not intend for the MOU to authorize any specific amount of compensation when the parties entered into it.

{¶ 21} Citing *Oglebay Norton Co. v. Armco*, 52 Ohio St.3d 232 (1990), Gibson argues that the lack of a specific pricing provision does not render the MOU unenforceable because a court may fill in gaps with extrinsic evidence if the parties have clearly intended to be bound. *Oglebay* relied upon the "gap filling" provision that typically applies to the sale of goods in Section 2-305 of the Uniform Commercial Code, as well as Comment a to Section 33 of the Restatement of the Law 2d, Contracts, to enforce a contract for shipping services. *Id.* at 236-37. As codified at R.C. 1302.18(A), the "gap filling provision" states that:

> The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:
>
> (1)  nothing is said as to price; or
>
> (2)  the price is left to be agreed by the parties and they fail to agree; or
>
> (3)  the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and if it is not so set or recorded.

{¶ 22} *Oglebay* quoted the following language from Comment a to the Restatement, which similarly provides that:

> [T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though

one or more terms are missing or are left to be agreed upon. In such cases courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.

An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary.

*Oglebay* at 236.

{¶ 23} We have previously held that a two-step process applies to determine the enforceability of "a services contract with a significant open term" under *Oglebay*. *Malaco Constr. v. Jones*, 10th Dist. No. 94APE10-1466 (Aug. 24, 1995); *Cook & Son-Pallay, Inc. v. Hillman*, 10th Dist. No. 14AP-44, 2014-Ohio-5444. First, a court must determine "whether the parties intended to be bound by the terms of the contract despite the failure to reach an accommodation on price." *Malaco* at 18. If so, the court may then "fill the open price term with a 'reasonable price' in accordance with the above-cited restatement language and by analogy with sale of goods situations under R.C. 1302.18(A) (UCC Section 2-305)." *Id.* at 19.

{¶ 24} Here, the *Oglebay* analysis fails at the first step. As discussed, in light of the precondition that any "reasonable compensation" must "be evaluated" before payment, we conclude that the MOU expresses no intent by the parties to be bound to a breachable price term. Moreover, the MOU does not suggest that the parties contracted in spite of a "failure to reach an accommodation on price," a situation addressed by the second *Oglebay* step. *Malaco* at 18. Rather, the MOU evidences an intent to postpone any discussion of "reasonable compensation," contingent upon future "evaluation" and approval, in light of Grand Valley and the OSFC's authority to determine the permissible scope of the remedial work to be performed.

{¶ 25} For a number of other reasons, the *Oglebay* holding does not extend to this case. First, unlike the MOU, the *Oglebay* contract contained a mechanism for calculating a specific price. *Oglebay* at 235. For 25 years, the *Oglebay* parties performed under an agreement to ship steel, all the while charging and collecting a price that the contract set by reference to an annually published industry standard, until economic conditions forced them to renegotiate the price each year. *Id.* By the time negotiations failed and the parties

litigated the price in court, the industry standard was no longer being published. *Id.* In the instant case, however, the MOU references no external pricing mechanism to determine a specific price, but mentions only "reasonable compensation" that must be "evaluated." Nor have the parties repeatedly performed in accordance with this provision over an extended period, which was another factor that led the *Oglebay* court to analogize the shipping contract to a sale of goods under the UCC. Furthermore, in the cases where we have applied *Oglebay* to a services contract, the agreements contained stronger indications of the parties' intent to be bound by a pricing term. *Malaco* at 15 (applying *Oglebay* where term in agreement titled "Compensation" required a minimum payment of $10,000 on a specific day of each month); *Cook* at ¶ 2, 10 (applying *Oglebay* and holding that a contract for funeral services "contain[ing] a series of preprinted boxes for itemization of charges" that listed all charges except for obituaries, indicating item "to be added," indicated intention to be bound to "the as-yet unascertainable cost of placing obituaries in local news outlets"). We discern no such intent in the plain language of the MOU.

{¶ 26} Gibson also argues that Court of Claims erred by finding that it had not produced evidence that Grand Valley or the OSFC agreed to pay for work in excess of the $20,000 authorized by the purchase order because the MOU "does not reference the purchase order or limit payment to Jack Gibson to $20,000." (Appellant's Brief, 19.) It is not clear how a reference to the MOU in the purchase order would support Gibson's argument. If anything, it would only reinforce the MOU's requirement to obtain approval of compensation for any work performed, as the purchase order represents the only instance when the parties complied with that condition before paying Gibson for the remedial work. The Court of Claims correctly identified the purchase order as the only agreement before it that authorized payment to Gibson.

{¶ 27} Finally, Gibson argues that Grand Valley and the OSFC did not present undisputed evidence that entitled them to summary judgment on its breach of contract counterclaim because their refusal to pay did not amount to evidence that the MOU did not require them to pay Gibson. Thus, Gibson believes that the Court of Claims should not have relied upon the affidavit of a Grand Valley representative discussing the $20,000 payment under the purchase order. According to Gibson, this creates a genuine issue of

material fact regarding the scope of work it performed and whether the parties intended to be bound by the MOU. (Appellant's Brief, 20-22.)

{¶ 28} This argument ignores the fact that the Court of Claims based its analysis on the unambiguous language of the MOU and concluded, as a matter of law, that the agreement did not contain the term that is the basis for Gibson's counterclaim. We agree with that court that the obligation asserted Gibson's breach of contract counterclaim is an attempt to read a term into the agreement that did not exist. Thus, without resorting to any evidence, whether disputed or not, we conclude that Gibson's counterclaim fails as a matter of law.

{¶ 29} For the foregoing reasons, the first assignment of error is overruled.

## IV. SECOND, THIRD, AND FOURTH ASSIGNMENTS OF ERROR

{¶ 30} Gibson's second assignment of error states: "R.C. 5705.412 specifically applies to school districts and controls over the provisions of R.C. 5705.41, a general statute that applies to subdivisions or taxing districts." Gibson states that it was error for the Court of Claims to hold that the lack of R.C. 5705.41 funds certification was an alternative grounds for holding that the MOU was not enforceable. Gibson asserts that a certification of funds under R.C. 5705.412 would actually be the applicable certification, as that provision specifically applies to expenditures by school districts. However, the third assignment of error further asserts that the MOU did not require *any* statutory certification of funds because the account from which the funds for remedial work was to be paid was "funded by proceeds from a local bond levy and state construction assistance funds administered by the OSFC," not from Grand Valley's general funds.

{¶ 31} As we have held, the provision of the MOU on which Gibson bases its counterclaim was not enforceable. Because the MOU was not an agreement that authorized any particular expenditure of funds, it was not required to be accompanied by a certification of funds under either statutory provision. Thus, any error resulting from the Court of Claims' alternative basis for granting summary judgment was harmless.

{¶ 32} The same principle applies to the fourth assignment of error, in which Gibson argues that the Court of Claims inappropriately relied on an argument raised by Grand Valley and the OSFC in their reply brief as an alternative basis for granting summary judgment in their favor. The Court of Claims found that even if the MOU had

been enforceable, Gibson pointed to no evidence in the record to show that the agreement satisfied the requirements of R.C. 3313.46, the competitive bidding statute that governs contracts for school building repairs. As with the second and third assignments of error, the lack of an enforceable agreement renders any error resulting from this alternative holding harmless. For these reasons, the second, third, and fourth assignments of error are overruled.

## V. CONCLUSION

{¶ 33} Assuming that Gibson performed repair work on the school building worth $138.789.13, as it asserts, this court is mindful that the result of this appeal leaves it without a remedy. However, Gibson performed the work without having the compensation for it "evaluated prior to and/or as work progresse[d]," as the MOU required. Furthermore, Gibson chose to perform this work under an agreement that bore no indication of complying with any of the previously mentioned statutory provisions that govern school building contracts, even after entering into and performing under a purchase order that bore statutory certification. Given these facts, Gibson performed the work in question at its own risk. If the result is harsh, hopefully the tale is cautionary. *See, e.g., Empire Gas Corp. v. Westerville Bd. of Edn.*, 102 Ohio App.3d 613, 618 (10th Dist.1995) (holding that a contract between a natural gas company and a school board that lacked the certification required by R.C. 5705.412 was void under the "clear and specific" language of the statute, even though "the result is harsh").

{¶ 34} Having overruled all assignments of error, the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

TYACK, J., concurs.
LUPER SCHUSTER, J., concurs in judgment only.

———————————————